## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **SEAN LOWELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO:** |
| | ) | |
| **ROHR, INC., d/b/a** | ) | **JURY DEMAND** |
| **COLLINS AEROSPACE,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

## I.   INTRODUCTION

1.      This is an action alleging violations of Title VII of the Act of Congress known as the "Civil Rights Act of 1964," as amended, 42 U.S.C. §2000e et seq., and 42 U.S.C. §1981, brought by Sean Lowell against his former employer, Defendant Rohr Inc., doing business as Collins Aerospace.  During his employment, Plaintiff was treated differently based on his race.  He complained about discrimination based on his race and, after his complaints, Plaintiff alleges that Defendant discriminated against him based on his race, and retaliated against him by, inter alia, subjecting him to heightened scrutiny, failing to comprehensively investigate his complaints, disciplining him, and terminating his employment.  Plaintiff seeks injunctive relief,

equitable relief, reinstatement, lost wages and benefits, compensatory damages, punitive damages, and reasonable attorney fees and costs.

## II.  <u>JURISDICTION</u>

2.    The jurisdiction of this Court is invoked pursuant to the Act of Congress known as 28 U.S.C. §§1331, 1334(4), 2201 and 2202, 42 U.S.C. §2000e *et seq*. This suit is authorized and instituted pursuant to Title VII of the Act of Congress known as the "Civil Rights Act of 1964," as amended, by the "Civil Rights Act of 1991", 42 U.S.C. §2000e *et seq*., and 42 U.S.C. §1981. The jurisdiction of this Court is invoked to secure protection of and redress deprivation of rights secured by 42 U.S.C. §2000 *et seq*. providing for injunctive and other relief against race discrimination in employment.

3.    Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC), which included allegations of race discrimination and retaliation.  Plaintiff further filed this suit within 90 days after receipt of his right-to-sue letter issued from the EEOC.  There are no administrative prerequisites to the maintenance of a claim for race discrimination or retaliation pursuant to 42 U.S.C. 1981.

## III.  <u>PARTIES</u>

4.    Plaintiff Sean Lowell is a Caucasian citizen of the United States and a resident of the State of Alabama.  At all times relevant to this lawsuit, Plaintiff was

employed by Defendant.

5.     Defendant Rohr Inc., d/b/a Collins Aerospace (hereinafter "Collins" or "Defendant"), is an employer doing business in this district, and at all times relevant to this action, the Defendant was an employer of Plaintiff Lowell within the meaning of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981.

## IV.   FACTS

6.     Plaintiff re-alleges and incorporates by reference paragraphs 1-5 with the same force and effect as if fully set out in specific detail hereinbelow.

7.     Defendant owns and operates a plant in Foley, Alabama that manufactures parts for military and commercial planes and aircraft systems.

8.     In April of 2012, Plaintiff Sean Lowell began working as a processor at the Foley plant.

9.     Lowell moved into the position of painter at the plant and in 2017 was promoted to Team Lead.

10.    As a Team Lead in the Painting Department, Lowell supervised about 15-20 employees.

11.    In or around 2020, the plant became known as Collins Aerospace.

12.    Lowell's job did not change and he continued to perform well.

13.    In November of 2021, Defendant promoted Lowell to the position of

Senior Team Lead.  In that position, Lowell continued to directly supervise about 15-20 employees, but also took on more production oversight duties.

14.    In November of 2022, Defendant promoted Lowell again.  Lowell's new position was Senior Team Lead Paint/Aerostructures.  In that position, Lowell was the direct supervisor for three Team Leads, who oversaw approximately 45 employees, located in two different areas of the Foley plant (Building 2 and Building 8).

15.    On a daily basis, Lowell performed quality checks, oversaw production, addressed manpower needs, answered questions from offsite engineers, and completed paperwork related to his department.

16.    He would also fill in for Team Leads when they were out.

17.    The three individuals who held Team Lead positions under Lowell were responsible for documenting and addressing their employees' behavior, including any failures to meet production standards, attendance issues, and safety violations.

18.    Because Lowell was responsible for the safe and efficient operation of the Paint/Aerostructures area, when Lowell directly observed or learned that an employee was failing to meet production standards, being late or missing work, committing safety violations, or engaging in other behavior that was against company policy or procedure, Lowell would ensure that the Team Lead and the

employee were aware of the issue and that the issue was appropriately documented and addressed.

19.    When an employee's conduct reached a point where more advanced discipline such as a written warning, final written warning, or termination could be recommended, Lowell followed company policy and involved Human Resources personnel.

20.    Lowell held all employees under his supervision to the same standards for performance.

21.    In or around April of 2023, Defendant's Human Resources manager, Carollyn Griffin (white), called Lowell and told him that two employees in the paint shop in Building 2 had reported that Lowell was treating them differently based on their race.

22.    Lowell is white.  The two employees who made the complaint (Ashton Elliot and Valontai Adams) are black.

23.    Lowell explained that he treats all employees the same; so when Elliot and Adams demonstrated performance issues, he addressed them in the same way he addressed them with all employees who demonstrated similar problems.

24.    Lowell continued to perform his job, which required him to enforce Defendant's rules and procedures, including when they were violated by Elliot and Adams.

25.    Throughout Lowell's employment, Elliot and Adams engaged in conduct such as being late, sleeping at work, taking breaks during the work day that were too long, and failing to timely complete work.

26.    After a verbal discussion or disciplinary action against Elliot or Adams, Lowell would often be contacted by HR and questioned about the specifics, but that did not happen when he disciplined white employees.

27.    Other employees began coming to Lowell and telling him that Elliot and Adams were telling co-workers that Lowell was racist and had chosen to discipline them for certain conduct just because they were black.  Lowell was also told that Elliot and Adams were alleging that Lowell was following them around the plant.

28.    Lowell became concerned about being able to perform his job duties effectively in light of the employees' statements.  As a result, he shared the statements and his concerns with his direct supervisor, Tony Garnett (white), who told him to just continue doing his job.

29.    In August of 2023, one employee came to Lowell to report that Elliot and Adams claimed they wanted to get Lowell fired and planned to pin racist things on Lowell to make that happen.

30.    Lowell reported this threat to Derek Eberly (white), a member of Defendant's Ethics Department who worked at the Foley plant.

31.     Lowell also shared this with Garnett, who recommended that they meet with HR to discuss how best to handle the situation.

32.     On or about September 8, 2023, Lowell had a video-conference call with Griffin and Garnett.  Josh Smalls (black), Defendant's Director of Human Resources (Griffin's supervisor), was also on the call.

33.     Garnett led the call, explaining the performance issues Elliot and Adams were having, Lowell's efforts to address them, and the continued complaints from Elliot and Adams alleging that Lowell's actions were racist.

34.     Lowell also relayed the employees' specific threat to get him fired by pinning racist things on him, as reported to him by another employee.

35.     Garnett and Lowell explained that Lowell was concerned about not being able to do his job effectively.

36.     Smalls accused Lowell of retaliating against Elliot and Adams by moving them to different areas in the paint shop.

37.     Both Garnett and Lowell explained that such moves happened often and were necessitated by changing manpower and workflow needs.

38.     Smalls claimed that such moves needed to be approved through HR.

39.     Lowell asked if leaders could be discriminated against or retaliated against.  Smalls said they could.

40.     Lowell said that he believed Elliot and Adams were discriminating and

retaliating against him.

41.     Lowell explained that he felt that the real reason Elliot and Adams were upset with him was because he was enforcing company rules and policies and they were making up stories about Lowell being racist so that Lowell would get in trouble and Elliot and Adams' disciplinary issues would be ignored, allowing them to remain employed.

42.     Smalls got visibly upset.  He raised his voice and said that was not happening.

43.     Smalls told Lowell to do his job and the call ended.

44.     Neither Smalls nor Griffin offered any suggestions for Lowell in how to handle future performance issues with Elliot or Adams.

45.     A few days after the conference call, Jason Gandrea, a member of Defendant's Ethics Department, called Lowell.  Lowell again explained the difficulties he was having with Elliot and Adams.

46.     In October, 2023, after not hearing anything else about the allegations of racism against him, Lowell followed up with Eberly.  Eberly told Lowell that Ethics did not find any wrongdoing on Lowell's part.

47.     In mid December, 2023, Lowell was asked to meet with Garnett and Jerry Jackson (black), Defendant's General Manager for the Foley plant.

48.     Jackson said he had been asked to give Lowell a documented Coaching,

but Jackson also said he didn't know why he had been asked to do so.

49.    In the Coaching document Jackson provided, Defendant said that conversations with Lowell's leaders and employees in the paint shop had highlighted behaviors from Lowell that were not in line with company values.

50.    When Lowell asked for specific examples, Jackson said he did not know of any.

51.    According to the Coaching, Lowell was supposed to complete two online training modules.  After that, a member of management was supposed to conduct bi-weekly meetings with Lowell to discuss his behaviors.

52.    Lowell timely completed the training modules and notified management.

53.    Defendant did not schedule or conduct any follow up meetings with Lowell.

54.    After the coaching, Lowell again spoke with Eberly about his concerns regarding the allegations from Elliot and Adams that Lowell was treating them differently based on race and how those continued allegations were adversely impacting his ability to do his job.

55.    Eberly put Lowell in contact with Chris Guyer, Defendant's Ethics manager, who eventually set up a call for Lowell with Michael (last name unknown), another ethics person out of Jacksonville.  Lowell continued to explain his concerns,

but received no assistance or suggestions on how to handle the situation.

56.    In or around January 2024, Lowell talked with Garnett and Donnie Jouilian (white supervisor on the A220 line) about a transfer. The A220 line is in a different building and section of the plant than the Paint Department. Lowell was willing to move down to just being a Team Lead to get away from Elliot and Adams.

57.    Garnett and Jouilian indicated that they had submitted the transfer and were just waiting for final approval, but in or around February, after Garnett left the company, Lowell was told the transfer had been rejected.

58.    Marcos Martinez (Hispanic) replaced Garnett as Lowell's direct supervisor.

59.    Lowell told Matinez about the past allegations of racist conduct from Elliot and Adams. Lowell also told Martinez that Lowell had been told one of his Leads was also telling employees that Lowell was racist. Lowell assured Martinez that he had always done his job to the best of his ability and treated everyone fairly.

60.    Martinez did not discipline or coach Lowell for any issues.

61.    In April of 2024, Michael Burts, a Quality Assurance employee at the Foley plant, reported that Elliot and Adams had left work early.

62.    Lowell asked Josh Roszkowski, the employees' Team Lead in the Paint Shop, to investigate.

63.    Roszkowski reported that Elliot and Adams left the shop to change

Elliot's tire in the parking lot while on the clock and without asking for permission. Both came back to the shop and clocked out later, making it look like they had been in the shop the entire time and thus getting paid for that time.

64.     Lowell believed this conduct violated Defendant's policies and reported the violation to Human Resources.

65.     When HR asked for more information about the incident, Lowell asked Roszkowski to speak with HR because he had investigated.

66.     Griffin asked Roszkowski if he was the person who saw Elliot and Adams leaving the shop early or if it had been Lowell.

67.     Griffin also told Roszkowski that an employee had witnessed Lowell yelling at Roszkowski on the shop floor.

68.     Roszkowski said that did not happen.

69.     On or about May 7, 2024, Gandrea called Lowell.

70.     Gandrea asked if Lowell had made any recordings of employees the previous week.

71.     Lowell explained that there was an audit coming up and so, as part of his job, Lowell had been going around taking picture of paints and primers that were not labeled as well as expired chemicals that needed to be addressed.

72.     Additionally, as part of his regular job duties, Lowell would sometimes take pictures of Standard Work in his area.

73.     Gandrea said that Adams had accused Lowell of videoing him in the paint shop.

74.     Lowell denied videoing Adams.

75.     No one asked Lowell to provide the pictures he took during that past week.

76.     In the morning of May 10, 2024, Martinez asked Lowell to come to the office.

77.     Ashley Osik, an on-site Human Resources representative, was present in person with Martinez in the office.  Griffin was present on the phone.

78.     Griffin told Lowell that there had been no improvement in his performance.

79.     Lowell asked what the performance issues were.  Lowell said that Martinez had not given him any coachings at all.

80.     Griffin said she did not have to discuss the performance issues with Lowell and refused to provide any details.

81.     Griffin told Lowell he was terminated.

82.     In terminating Plaintiff, Defendant intentionally, willfully, and maliciously discriminated against Plaintiff, based on his race.

83.     When a black employee in a supervisory role demonstrated performance problems, Defendant did not terminate that employee, but instead

moved him to a different position in the plant.

84.     Plaintiff was treated differently on account of his race in regards to discipline, transfers, job duties, and termination.

85.     Defendant also failed to fully and comprehensively investigate Plaintiff's complaints of discrimination based on race or his complaints of retaliation for his earlier complaints of discrimination based on race in the same manner that it investigated similar complaints from non-white employees.

86.     For example, when black employees made complaints of discrimination or retaliation, Defendant interviewed all witnesses mentioned by the complaining employee; however, in response to Plaintiff's complaints, Defendant did not interview all witnesses Plaintiff mentioned.

87.     Plaintiff further asserts that Defendant's adverse actions were in retaliation for complaining about discriminatory treatment, based on race.

88.     As a result of Defendant's actions and inactions described above, Plaintiff has suffered extreme harm, including, but not limited to, loss of employment opportunities, denial of wages, compensation, and other benefits and conditions of employment.  Additionally, Plaintiff has suffered injury including pain, humiliation, emotional distress, mental anguish and suffering, and loss of enjoyment of life.

## V.     CAUSES OF ACTION

### A.     RACE DISCRIMINATION - DISPARATE TREATMENT IN VIOLATION OF TITLE VII

89.     Plaintiff re-alleges and incorporates by reference paragraphs 1-88 with the same force and effect as if fully set out in specific detail hereinbelow.

90.     Plaintiff was subjected to disparate treatment by Defendant Rohr Inc, based on his race.

91.     Plaintiff was subjected to heightened scrutiny, disciplined, and terminated for conduct that other non-white co-workers also engaged in without involvement or discipline from management.

92.     Plaintiff was subjected to heightened scrutiny, disciplined, and terminated because of his race.

93.     Defendant failed to investigate Plaintiff's complaints of discrimination and retaliation based on race in the same manner that it investigated similar complaints from non-white employees.

94.     Defendant had no legitimate, non-discriminatory reason for its conduct related to the disparate treatment or the termination.

95.     Defendant's reasons for its actions and inactions are pretext for race discrimination.

96.    Plaintiff's white race was at least a motivating factor in the adverse employment actions Defendant took against him, up to and including his termination.

97.    Because of Defendant's conduct, Plaintiff has suffered loss of income and employment benefits as well as severe emotional distress, embarrassment, and humiliation.

98.    Defendant's actions were willful, with malice and with reckless disregard for Plaintiff's rights.

## B.    RETALIATION- IN VIOLATION OF TITLE VII

99.    Plaintiffs re-allege and incorporate by reference paragraphs 1-88, above with the same force and effect as if fully set out in specific detail hereinbelow.

100.    Plaintiff complained to his supervisors about race discrimination. Plaintiff made complaints to Defendant's Human Resources managers about being treated differently on the basis of his race and being falsely accused of treating others differently based on their race.  Plaintiff also made complaints to individuals in Defendant's Ethics Department about race discrimination.

101.    Plaintiff had a good faith belief that the conduct was discriminatory.

102.    Defendant failed to fully investigate Plaintiff's complaints of discrimination based on race and retaliation based on race.

103.   As a result of Plaintiff's complaints, Plaintiff was subjected to heightened scrutiny, disciplined, and terminated.

104.   Plaintiff engaged in protected activity.

105.   Plaintiff was subjected to adverse actions.

106.   Defendant's actions are casually related to Plaintiff's protected activity. A casual connection exists between the protected activity and Defendant's adverse actions.

107.   Defendant's conduct was pretext for retaliation.

108.   Plaintiff was treated differently than similarly situated individuals who did not complain of discrimination.

109.   Because of Defendant's conduct, Plaintiff has suffered loss of income and employment benefits as well as severe emotional distress, embarrassment, and humiliation.

110.   Defendant engaged in the practices complained of herein with malice and/or reckless indifference to Plaintiff's federally protected rights.

111.   Plaintiff seeks to redress the wrongs alleged herein and this suit is their only means of securing adequate relief.   Plaintiffs are now suffering and will continue to suffer irreparable injury from the Defendant's unlawful policies and practices as set forth herein unless enjoined by this Court.

### C.   **RACE DISCRIMINATION - DISPARATE TREATMENT IN VIOLATION OF 42 U.S.C. 1981**

112.   Plaintiffs re-allege and incorporate by reference paragraphs 1-88 with the same force and effect as if fully set out in specific detail hereinbelow.

113.   Plaintiff was subjected to disparate treatment by Defendant based on his race.  But for his race, Plaintiff would not have suffered this disparate treatment.

114.   Plaintiff was subjected to heightened scrutiny, disciplined, and terminated for conduct that other non-white co-workers also engaged in without involvement or discipline from management.

115.   Defendant failed to investigate Plaintiff's complaints of discrimination and retaliation based on race in the same manner that it investigated similar complaints from non-white employees.

116.   Plaintiff was subjected to heightened scrutiny, disciplined, and terminated because of his race.

117.   Defendant had no legitimate, non-discriminatory reason for its conduct related to the disparate treatment or the termination.

118.   Defendant's reasons for its actions and inactions are pretext for race discrimination.

119.   Because of Defendant's conduct, Plaintiff has suffered loss of income and employment benefits as well as severe emotional distress, embarrassment, and humiliation.

120.   Defendant's actions were willful, with malice and with reckless disregard for Plaintiff's rights.

### D.   RETALIATION-IN VIOLATION OF 42 U.S.C. 1981

121.   Plaintiffs re-allege and incorporate by reference paragraphs 1-88 above with the same force and effect as if fully set out in specific detail hereinbelow.

122.   Plaintiff complained to his supervisors about race discrimination. Plaintiff made complaints to Defendant's Human Resources managers about being treated differently on the basis of his race and being falsely accused of treating others differently based on their race.  Plaintiff also made complaints to individuals in Defendant's Ethics Department about race discrimination.

123.   Plaintiff had a good faith belief that the conduct was discriminatory.

124.   As a result of Plaintiff's complaints, Plaintiff was subjected to heightened scrutiny, disciplined, and terminated.

125.   Plaintiff engaged in protected activity.

126.   Plaintiff was subjected to adverse actions.

127.   Defendant failed to fully investigate Plaintiff's complaints of discrimination based on race and retaliation based on race.

128.   Defendant's actions are casually related to Plaintiff's protected activity. A casual connection exists between the protected activity and Defendant's adverse actions.

129.   Defendant's conduct was pretext for retaliation.

130.   Plaintiff was treated differently than similarly situated individuals who did not complain of discrimination.

131.   Because of Defendant's conduct, Plaintiff has suffered loss of income and employment benefits as well as severe emotional distress, embarrassment, and humiliation.

132.   Defendant engaged in the practices complained of herein with malice and/or reckless indifference to Plaintiff's federally protected rights.

133.   Plaintiff seeks to redress the wrongs alleged herein and this suit is their only means of securing adequate relief.  Plaintiff is now suffering and will continue to suffer irreparable injury from the Defendant's unlawful policies and practices as set forth herein unless enjoined by this Court.

## VI.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court assume jurisdiction of this action and after trial:

1.   Issue a declaratory judgment that the employment policies, practices, procedures, conditions and customs of the Defendant are violative of the rights of the Plaintiff as secured by Title VII of the Act of Congress known as the "Civil Rights Act of 1964," as amended, by the "Civil Rights Act of 1991," 42 U.S.C. §2000e *et seq*., and 42 U.S.C. §1981.

2.     Grant Plaintiff a permanent injunction enjoining Defendant, its agents, successors, employees, attorneys and those acting in concert with the Defendant and at the Defendant's request from continuing to violate Title VII of the Act of Congress known as the "Civil Rights Act of 1964," as amended by the "Civil Rights Act of 1991," 42 U.S.C. §2000e *et seq.,* and 42 U.S.C. §1981.

3.     Enter an order requiring Defendant to make Plaintiff whole by awarding back-pay (plus interest), front-pay, punitive damages, compensatory damages, nominal damages, declaratory relief, injunctive relief, and benefits.

4.     Plaintiff further prays for such other relief and benefits as the cause of justice may require, including but not limited to, an award of costs, attorney's fees, and expenses.

Dated: September 26, 2024

Respectfully submitted,

*/s/ Rachel L. McGinley*
Rachel L. McGinley
Alabama State Bar Number: 1892-A64M
WIGGINS, CHILDS, PANTAZIS, FISHER & GOLDFARB
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500


**PLAINTIFF HEREBY DEMANDS A TRIAL BY STRUCK JURY.**

Plaintiff requests this Honorable Court to serve via certified mail upon the Defendant the following: Summons, Complaint.

**DEFENDANT'S ADDRESS:**

Rohr, Inc., d/b/a Collins Aerospace
CT Corporation (Registered Agent)
2 North Jackson Street, Suite 605
Montgomery, Alabama 36104

*/s/ Rachel L. McGinley*
OF COUNSEL